Rhonda Sue **BENHARDT**, Plaintiff,

v.

**BOARD OF COUNTY COMMISSIONERS OF the COUNTY OF WYANDOTTE and Wyandotte County Sheriff,** Defendants.

**No. Civ.A. 97–2216–EEO.**

United States District Court,
D. Kansas.

June 18, 1998.

Brian C. Fries, Sylvester James, Jr., Kenner & James, P.C., Kansas City, MO, for Rhonda Sue Benhardt, plaintiff.

Daniel B. Denk, McAnany, Van Cleave & Phillips, P.A., Kansas City, KS, for Board of County Commissioners of the County of

Wyandotte, Sheriff, Wyandotte County, Kansas.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, District Judge.

This matter is before the court on defendants' motion for summary judgment (Doc. # 32). After careful consideration of the parties' briefs and evidentiary materials, the court is prepared to rule. For the reasons set forth below, defendants' motion will be granted.

### Factual Background

For purposes of defendants' motion, the following is a brief summary of the material facts that are uncontroverted or deemed admitted pursuant to Federal Rule of Civil Procedure 56 and District of Kansas Rule 56.1.

Plaintiff Rhonda Sue Benhardt is a white female. The County hired plaintiff in December 1990 to work as a deputy in the Sheriff's Department. In 1992, the County reassigned plaintiff to work in the Detention Center. In 1994, plaintiff was transferred to the Court Transport Section but returned to work in the Detention Center on June 11, 1995. Plaintiff resigned her employment with the County on November 17, 1995. Plaintiff filed a charge of discrimination with the Kansas Human Rights Commission on May 2, 1996.

In early 1993, James Williams, a deputy sergeant in the Sheriff's Department, showed the plaintiff pictures of himself with naked women. Plaintiff gave the pictures back to Williams and said she "did not want to look at the damn things." To plaintiff's knowledge, Williams never brought the pictures to work again. Plaintiff believes she was the only person in the Detention Center who saw the pictures. In 1993, Williams made a comment to plaintiff that in the Philippines a good man could buy a 12 year old for $200. Plaintiff responded "No, a good man would not buy a fucking 12 year old child." Williams was subjected to a criminal investigation as a result of plaintiff's complaints regarding the above two incidents.

In December 1993, plaintiff went to the 403 Club, a private club, after her shift ended. While at the club, Sergeant Martone, who also was off-duty, kissed the plaintiff twice in immediate succession. Plaintiff pushed Martone away and he walked away. Plaintiff did not make a written complaint about the incident. During portions of 1994, Martone supervised plaintiff's work. Martone would rub the plaintiff's arm when she would go to him to obtain his signature on papers. Plaintiff does not recall reporting any of these incidents to any lieutenants in the Sheriff's Department. Martone wrote the plaintiff up for discipline approximately ten to twelve times during 1994. Martone did not suspend the plaintiff or, to plaintiff's knowledge, recommend that she be suspended. Martone did not have that power.

In September 1994, plaintiff informed Captain Dewey Bond of her concern that Martone was criticizing her too much and that he had kissed her at the 403 Club. Bond told plaintiff that he would take care of the situation and see to it that it did not happen again. Plaintiff has no evidence that Martone sexually harassed her after she informed Bond of her concerns.

On August 29, 1994, plaintiff left her post early and did not report to work the next day. When the plaintiff spoke to Bond about her situation on or about September 13, 1994, she told him that she was suffering from too much stress, was drinking too much off-duty, was having nightmares, and was having marital problems. Plaintiff was suspended for leaving her post and was required to receive counseling as a condition of continued employment with the County. The suspension was not imposed because the plaintiff had complained of or reported any acts of sexual harassment. Bond recommended the discipline, which Scott Hutton, the jail administrator, imposed.

Prior to June 11, 1995, Sergeant Trumbo came out of his office with his sweat pants on near the end of his shift. While standing in the middle of a large room where a number of deputies worked, Deputy Spellman came up behind Trumbo and pulled Trumbo's sweat pants down to his hips. Trumbo had his back to plaintiff. Trumbo then pulled his sweat pants down below his buttocks area for a period of seconds. In response, plaintiff cussed and then went to the break room. Plaintiff thought Trumbo's actions were

tacky. In the break room, plaintiff told deputy Stephanie Eickhoff that Trumbo had "showed his ass" and Eickhoff asked what Trumbo's butt looked like. Plaintiff said "smooth as a baby's butt." Plaintiff did not report the event to any supervisory officer nor make any complaint.

In the Summer of 1995, Deputy Jason Allen walked into the women's dressing room when the plaintiff was present. Plaintiff said "What the hell are you doing in here" and get the fuck out of here. Allen went into the dressing room to get a pack of cigarettes belonging to Sherry Davenport at her request. Allen told the plaintiff that he had knocked before he entered. Plaintiff did not hear Allen knock.

After June 11, 1995, prior to roll call for the deputies in the Detention Center, deputies Dave Clintsman and Mark Rousch, in plaintiff's presence, would tell each other to "hug these nuts" and to "suck this dick." In response, plaintiff told them to "shut the fuck up." Plaintiff acknowledges that all of the deputies cussed. Plaintiff herself cussed on the job and used the words "fuck" and "motherfucker." Plaintiff occasionally used the word "cocksucker." Plaintiff told sexually oriented jokes in the workplace, including jokes about oral sex. Plaintiff did not find the terms "fuck," "motherfucker," and "cocksucker" to be offensive. Plaintiff was not offended by sexually oriented jokes.

On November 15, 1995, plaintiff asked Lieutenant Pierce if she could get the next day off work. Pierce responded that he would not give her the day off because she had missed the last five out of ten days of work. After a verbal exchange with Pierce, plaintiff resigned her employment with the County. Plaintiff resigned because of "[t]he favoritism, just the crap [she] had been through, the Martone incident." Plaintiff had missed five of the ten days of work prior to asking Pierce for an additional day off. Plaintiff had used sick leave even though she was not sick. Plaintiff acknowledges that the Sheriff's Department was understaffed and that everybody had to work hard at their jobs, doing a lot more than normally might be required.

Plaintiff received copies of the policies of Wyandotte County and the Sheriff's Department prohibiting sexual harassment. Plaintiff skimmed the policies and understood them. Plaintiff was aware that a policy existed for reporting sexual harassment and that persons who engaged in such conduct would be disciplined. The County trained deputies, including plaintiff, concerning its policies prohibiting sexual harassment. Plaintiff understood that neither the County nor the Sheriff's Department condoned sexual harassment. Plaintiff also understood that an employee should file a complaint under the sexual harassment policy if they felt discriminated against. Plaintiff did not report any sexual harassment pursuant to the County's policies.

Plaintiff had a legal right to have the Fraternal Order of Police represent her if she had filed a grievance concerning her resignation from employment with the County. Plaintiff did not file a grievance when she resigned her employment with the County. Other than her own case, plaintiff does not have personal knowledge of any other sexual harassment in the Sheriff's Department.

The Board of County Commissioners adopted personnel regulations contained in the Personnel Policy Manual that apply to the Sheriff's Department. The Board is the final policymaker for personnel practices within the County. The policies prohibit discrimination based on sex and expressly prohibit sexual harassment and provide a mechanism for reporting sexual harassment. The Personnel Policy Manual also allows a person who believes they have been discriminated against to file a grievance that will be heard by the Board of County Commissioners. The Sheriff's employment decisions may be appealed to the Board of County Commissioners through the grievance process.

*Summary Judgment Standards*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202

(1986); *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

The moving party bears the initial burden of showing that there is an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga,* 942 F.2d 737, 743 (10th Cir.1991). Essentially, the inquiry as to whether an issue is genuine is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505. An issue of fact is genuine if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. 2505. This inquiry necessarily implicates the substantive evidentiary standard of proof that would apply at trial. *Id.* at 252, 106 S.Ct. 2505.

Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Securities, Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991). The nonmoving party may not rest on his pleadings but must set forth specific facts. *Applied Genetics,* 912 F.2d at 1241.

"[W]e must view the record in the light most favorable to the parties opposing the motion for summary judgment." *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.,* 938 F.2d 1105, 1110 (10th Cir.1991). "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith,* 853 F.2d 789, 793 (10th Cir. 1988). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson,* 477

U.S. at 256, 106 S.Ct. 2505. Where the nonmoving party fails to properly respond to the motion for summary judgment, the facts as set forth by the moving party are deemed admitted for purposes of the summary judgment motion. D.Kan. Rule 56.1.

### *Analysis*

### I. Time Bar—Title VII Claims.

Plaintiff has alleged various incidents of sexual discrimination and retaliation for reporting sexual harassment throughout her employment. Defendants argue that many of plaintiff's Title VII claims are barred because plaintiff failed to file a charge of discrimination with the Equal Employment Opportunity Commission or the Kansas Human Rights Commission within 300 days of the alleged discriminatory acts, which is a prerequisite to a civil suit. *See Martin v. Nannie and the Newborns, Inc.,* 3 F.3d 1410, 1414 (10th Cir.1993); *Laughinghouse v. Risser,* 754 F.Supp. 836, 839 (D.Kan.1990). Plaintiff argues that she has timely brought suit because the alleged incidents were part of a continuing violation. To invoke the continuing violation doctrine, plaintiff must establish either "(1) a series of related acts taken against a single individual, one or more of which falls within the limitations period, or (2) the maintenance of a company-wide policy of discrimination both before and during the limitations period." *Purrington v. University of Utah,* 996 F.2d 1025, 1028 (10th Cir. 1993) (*Bruno v. Western Elec. Co.,* 829 F.2d 957, 961 (10th Cir.1987)). A continuing violation is " 'one that could not reasonably have been expected to be made the subject of a lawsuit when it first occurred because its character as a violation did not become clear until it was repeated during the limitations period,' typically because it is only its cumulative impact (as in the case of a hostile work environment) that reveals its illegality." *Taylor v. Federal Deposit Ins. Corp.,* 132 F.3d 753, 765 (D.C.Cir.1997) (quoting *Dasgupta v. University of Wisconsin Board of Regents,* 121 F.3d 1138, 1140 (7th Cir.1997)).

### A. *Series Of Related Acts.*

Plaintiff argues that the various incidents of discrimination against her were a "series of related acts" sufficient to bring all

of the incidents within the statutory limitations period. "There must [ ] be at least one instance of the discriminatory practice within the filing period for the [continuing violation] doctrine to apply, and the earlier acts must be part of a continuing policy or practice that includes the act or acts within the statutory period." *Nannie and the Newborns*, 3 F.3d at 1415 (citing *Furr v. AT & T Techs., Inc.*, 824 F.2d 1537 (10th Cir.1987)). In determining whether the prior incidents of discrimination constitute a continuing course of discrimination or whether they are discrete unrelated acts, the Tenth Circuit has adopted the approach taken by the Fifth Circuit in *Berry v. Board of Supervisors of Louisiana State Univ.*, 715 F.2d 971, 981 (5th Cir.1983), *cert. denied*, 479 U.S. 868, 107 S.Ct. 232, 93 L.Ed.2d 158 (1986). In *Berry*, the court set forth several nonexclusive considerations, including: (i) subject matter—whether the violations constitute the same type of discrimination; (ii) frequency; and (iii) permanence—whether the nature of the violations should trigger an employee's awareness of the need to assert her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate. *See Nannie and the Newborns*, 3 F.3d at 1415. Courts examine the *Berry* factors collectively; a deficiency in one prong of the *Berry* test may be outweighed by strong evidence supporting the remaining two factors. *See id.* at 1416.

■ Plaintiff claims that the following incidents constitute a "series of related acts" sufficient to invoke the continuing violation doctrine: (1) Williams' display of pictures to plaintiff in early 1993, (2) Williams' comment in 1993 that a good man could buy a 12 year old for $200 in the Philippines, (3) Martone's after-hours attempt to kiss plaintiff in December 1993,[1] (4) Trumbo's display of his buttocks in June 1995, (5) Allen's entry into the women's locker room when plaintiff was present, (6) daily comments between deputies regarding oral sex during roll call in the Summer of 1995, and (7) Pierce's reference

to plaintiff as a bitch during an argument with plaintiff in November 1995. Plaintiff does not reference her allegation that Martone rubbed her arm during 1994, but the court also will consider this allegation as part of plaintiff's argument.

We first review whether the above incidents constitute the same type of discrimination. Incidents (1), (2), and (3), as well as plaintiff's allegation that Martone rubbed her arm during 1994, are best characterized as offensive comments or advances directed to plaintiff individually. On the other hand, incidents (4) and (6) can at most be characterized as offensive comments or gestures directed at an entire group of individuals, both male and female. Incident (5) falls into its own separate category and clearly is a discrete and unrelated act. Incident (7) also falls into its own category as simply an argument between plaintiff and her supervisor. Pierce called plaintiff a bitch after plaintiff requested an additional day off and after plaintiff told Pierce that he could "take this place [the Sheriff's Department] and stick it up your phony fucking ass." Plaintiff then responded to Pierce's comment by calling him a cocksucker.

Next, we analyze the frequency of the various alleged incidents. The roll call comments are the only acts which occurred frequently, apparently on a daily basis. The only other incident which occurred on more than one occasion was Martone's rubbing plaintiff's arm in 1994. All of the other alleged conduct occurred on a single occasion.

Finally, we look at the permanence of the various incidents, *i.e.*, whether the nature of the violations should trigger an employee's awareness of the need to assert her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate. *See Nannie and the Newborns*, 3 F.3d at 1415. Plaintiff apparently understood that she needed to assert her rights at the time of the

---

1. Plaintiff also alleges that her suspension in September 1994 after reporting the incident with Martone is part of the continuing violation. This alleged incident of retaliation clearly is untimely. The retaliation is a different type than any of the other incidents, the retaliation occurred on a single occasion, and the nature of the alleged discrimination should have triggered plaintiff's awareness to assert her rights shortly after her suspension.

Williams and Martone incidents, and did so. Plaintiff does not allege any discrimination by either William or Martone after she reported the incidents.

■ Applying the above factors of the type, frequency, and permanence of the alleged discrimination, we conclude that plaintiff's claim is limited to (1) the roll call comments regarding oral sex, (2) Trumbo's display of his rear end, and (3) Pierce's reference to plaintiff as a bitch. The only act outside of the statutory period arguably related to the roll call comments is Trumbo's display of his buttocks in June 1995. None of the incidents are similar to Pierce's argument with plaintiff in November 1995. The alleged incidents with Williams (1993), Martone (1993 and 1994), and Allen were isolated occurrences and should have led plaintiff to assert her rights at the time. Moreover, the William, Martone, and Allen incidents are quite different than the group horseplay that occurred during the Summer of 1995.[2]

B. *Company–Wide Policy.*

■ The court briefly will analyze whether a company-wide policy of discrimination existed sufficient to invoke the continuing violation doctrine, although plaintiff did not raise the issue in her opposition brief. Plaintiff presented evidence that eight other female employees possibly made complaints of sexual harassment between December 1990 and November 1995. Plaintiff has presented no evidence, however, whether these complaints were substantiated or whether defendants adequately investigated and responded to the complaints. The fact that eight other complaints were made during a five-year period in a department of unknown size simply is not sufficient for a reasonable jury to conclude that a company-wide policy of discrimination existed within the Sheriff's Department. Moreover, plaintiff specifically admitted that she understood that neither the County nor the Sheriff's Department

condoned sexual harassment. Finally, we note that the Sheriff's Department adequately responded to plaintiff's complaints regarding Williams and Martone because the harassment from these individuals ended after plaintiff voiced her concerns. Given the dearth of evidence and argument on the issue, the court finds that no reasonable jury could find that a company-wide policy of sexual discrimination existed at the Sheriff's Department.

For the above reasons, plaintiff's Title VII claim is limited to the roll call comments regarding oral sex, Trumbo's display of his buttocks, and Pierce's reference to plaintiff as a bitch.

II. **Constructive Discharge.**

■ Ms. Benhardt voluntarily resigned her employment at the Sheriff's Department. Therefore, she must rely on the theory of constructive discharge to support her claim of unlawful retaliation and sexual harassment. *See Cone v. Longmont United Hosp. Ass'n,* 14 F.3d 526, 529 (10th Cir.1994) ("'Discharge' by an employer is an essential statutory element of the prima facie case."). To establish constructive discharge, plaintiff must present evidence from which the jury could find that "a reasonable [person] would view the working conditions as intolerable." *Hirschfeld v. New Mexico Corrections Dep't,* 916 F.2d 572, 580 (10th Cir.1990) (quoting *Derr v. Gulf Oil Corp.,* 796 F.2d 340, 344 (10th Cir.1986)). The standard used for determining if a constructive discharge occurred is whether a reasonable person in the employee's position would have felt compelled to resign. *See Acrey v. American Sheep Indus. Assoc.,* 981 F.2d 1569 (10th Cir.1992) (citing *Derr,* 796 F.2d at 344); *Irving v. Dubuque Packing Co.,* 689 F.2d 170, 172 (10th Cir.1982). The fact that an employee was happy at her job and worked harmoniously with her co-workers does not preclude a finding of constructive discharge.

---

**2.** Although we need not reach the issue, we note that the roll call comments overheard by plaintiff apparently were not directed at "a single individual" and therefore the continuing violation doctrine may not be applicable under a related acts theory. *See Purrington,* 996 F.2d at 1028; *Sosa v. Hiraoka,* 920 F.2d 1451, 1455 (9th Cir.1990)

(holding that a continuing violation may be established by a company-wide policy or "by demonstrating a series of related acts against a single individual.") (quoting *Green v. Los Angeles County Superintendent of Schools,* 883 F.2d 1472, 1480 (9th Cir.1989)).

See *Mitchell v. Mobil Oil Corp.*, 896 F.2d 463, 467 (10th Cir.), *cert. denied*, 498 U.S. 898, 111 S.Ct. 252, 112 L.Ed.2d 210 (1990).

Plaintiff does not make any specific allegations as to why her working conditions were intolerable in November 1995. Liberally construing plaintiff's opposition brief, however, plaintiff maintains that her working conditions were intolerable in November 1995 because Lieutenant Pierce denied her requested days off, she was suspended in September 1994 for reporting Martone's sexual advances, and there were daily comments made between deputies shortly before roll call regarding oral sex. With respect to plaintiff's suspension in September 1994 and the denial of her requested days off in November 1995, no reasonable person would view either of these conditions as intolerable. In addition, a reasonable person would have brought the incidents to the attention of a supervisor or the EEOC. With respect to the daily comments regarding oral sex at roll call, we conclude that a reasonable person likely would be offended by these comments but would exercise other available options before resigning.

The Tenth Circuit has held that a reasonable person generally will exercise the internal grievance procedures of the company before resigning based on intolerable working conditions unless the filing of an internal complaint would be futile. See *Woodward v. City of Worland*, 977 F.2d 1392, 1402 (10th Cir.1992). Here, there is no evidence to suggest that filing an internal grievance based on the objectionable language at roll call would have been futile. Indeed, plaintiff concedes that she has no evidence that Martone sexually harassed her after she reported Martone's sexual advances to Captain Bond. Moreover, Williams was subjected to a criminal investigation as a result of plaintiff's internal complaints about Williams in 1993. No record evidence suggests that Williams sexually harassed plaintiff after plaintiff filed her complaint. In these circumstances, "a reasonable employee instead of resigning would first have pursued either or both of two courses—completed the internal grievance procedure, or filed a complaint with the EEOC." *Ugalde v. W.A. McKenzie Asphalt Co.*, 990 F.2d 239, 243 (5th Cir.1993) (quoting *Boze v. Branstetter*, 912 F.2d 801, 805 (5th Cir.1990)). For these reasons, we conclude that no reasonable jury could find that plaintiff was constructively discharged from her employment with the Sheriff's Department.

**III. Plaintiff's *Quid Pro Quo* Sexual Harassment Claims.**

To establish a prima facie case of *quid pro quo* sexual harassment, the plaintiff must show that (1) she is a member of a protected class, (2) she was subject to unwelcome sexual conduct, (3) concrete job benefits were conditioned on submission to the sexual conduct, and (4) adverse job consequences resulted from the employee's refusal to submit to the conduct. See *Nannie and the Newborns, Inc.*, 3 F.3d at 1416; *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1414 (10th Cir.1987). Under a *quid pro quo* theory of sexual harassment, the acceptance or rejection of the harassment by an employee must be an express or implied condition to the receipt of a job benefit or the cause of a tangible job detriment. See *Henson v. City of Dundee*, 682 F.2d 897, 909 (11th Cir.1982). By establishing a prima facie case, the plaintiff creates a presumption of unlawful discrimination that requires the defendant to produce evidence of a nondiscriminatory reason for its actions. See *Texas Dep't. of Community Affairs v. Burdine*, 450 U.S. 248, 254–55, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The plaintiff then has the burden of showing that the defendant's proffered reasons are not its true reasons but are pretextual for sex-based discrimination. See *id.* at 252–53, 101 S.Ct. 1089. The ultimate burden of persuasion of proving intentional discrimination remains at all times with the plaintiff. See *id.*

Plaintiff claims that her rejection of Martone's sexual advances resulted in increased supervision by Martone and a disciplinary proceeding. With respect to plaintiff's claim of increased supervision, plaintiff has failed to offer sufficient evidence that this increased supervision constitutes a "concrete" or "tangible" job detriment. Martone simply put written warnings in plaintiff's file approximately 10 to 12 times during 1994. No record evidence suggests that these written warnings adversely impacted the terms

and conditions of plaintiff's employment with the County. *See Starrett v. Wadley,* 876 F.2d 808, 820 (10th Cir.1989) (plaintiff must establish that the terms or conditions of her employment have been altered). Even if the court assumes that the written warnings are a tangible job detriment, plaintiff has failed to offer any evidence that defendant's proffered reason for the written warnings is pretextual for sex-based discrimination. *See Nannie and the Newborns,* 3 F.3d at 1418. Defendants maintain that the written warnings given to plaintiff were for improper job performance. Four administrators, other than Martone, disciplined plaintiff during the same time period. Plaintiff concedes that she does not believe that these other four administrators disciplined her based upon her sex. There is simply a dearth of evidence that Martone gave plaintiff written warnings because of his rejected sexual advances in December 1993.

We next turn to plaintiff's claim that she was subject to a disciplinary proceeding because she rejected Martone's advances. The court assumes that plaintiff is referring to the suspension and counseling ordered by Captain Bond in September 1994. With respect to this incident, plaintiff has failed to come forward with sufficient evidence for a jury to find a casual connection between her rejection of Martone's advances and her discipline in September 1994. Plaintiff concedes Martone did not suspend her, or to her knowledge, recommend that she be suspended. Plaintiff also admits that her suspension "was not imposed because [she] had complained of or reported any acts of sexual harassment." Moreover, defendants maintain that plaintiff was suspended because she left her post early one day. Plaintiff has offered no evidence to suggest that defendants' reason is pretextual for sex-based discrimination.

For the above reasons, the court concludes that no reasonable jury could find for plaintiff on her *quid pro quo* sexual discrimination claims.[3]

### IV. Plaintiff's Retaliation Claims.

Plaintiff alleges that defendants retaliated against her for reporting Martone's sexual advances by suspending her and denying her requests for days off. Plaintiff bears the initial burden to present a prima facie case by establishing that: (1) she engaged in protected activity; (2) her employer took adverse employment action against her subsequent to the protected activity; and (3) a causal connection exists between the protected activity and the adverse action. *See Sauers v. Salt Lake County,* 1 F.3d 1122, 1128 (10th Cir.1993) (citing *Williams v. Rice,* 983 F.2d 177, 181 (10th Cir.1993)). If plaintiff meets her burden, then the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. *See Conner v. Schnuck Markets, Inc.,* 121 F.3d 1390, 1395 (10th Cir.1997). The defendant need not prove the "absence of retaliatory motive, but only produce evidence that would dispel the inference of retaliation by establishing the existence of a legitimate reason." *Id.* at 1395 (quoting *Burrus v. United Tel. Co. of Kansas, Inc.,* 683 F.2d 339, 343 (10th Cir.), *cert. denied,* 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982)). If defendant produces evidence of a legitimate reason, the plaintiff may still prevail if she demonstrates the articulated reason was a mere pretext for discrimination. The overall burden of persuasion remains on the plaintiff. *See id.*

The "causal connection" element of a retaliation action merely requires that the plaintiff establish the protected activity and adverse action "were not wholly unrelated." *Whitten v. Farmland Indus., Inc.,* 759 F.Supp. 1522, 1539, n. 18 (D.Kan.1991). A causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action. *See Burrus,* 683 F.2d at 343 (citing *Grant v. Bethlehem Steel Corp.,* 622 F.2d 43, 46 (2d Cir.1980); *Womack v. Munson,* 619 F.2d 1292, 1296 & n. 6 (8th Cir.1980), *cert. denied,* 450 U.S. 979, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981)).

---

**3.** As we explained above, defendants also are entitled to summary judgment on plaintiff's *quid* *pro quo* sexual harassment claims because the claims are barred as untimely. *See supra* part I.

### A. Suspension And Counseling In September 1994.

Plaintiff has failed to offer evidence for a reasonable jury to find a causal connection between her report to Captain Bond of Martone's sexual advances and her suspension and counseling. Bond recommended the suspension and counseling which Scott Hutton, the jail administrator, imposed. Plaintiff concedes that she does not believe that Bond or Hutton disciplined her based upon her sex. Plaintiff also concedes that her suspension was not imposed because the plaintiff had complained of or reported any acts of sexual harassment. Although the short time period between plaintiff's reporting of Martone's sexual advances and her suspension normally would be sufficient to support an inference of causation, that inference would be impermissible in this case in light of plaintiff's admissions. We conclude that plaintiff has not come forward with sufficient evidence to establish a casual connection between her reports of Martone's advances and her suspension.

Even if the court assumed that plaintiff could establish a prima facie case, plaintiff has failed to offer sufficient evidence for a reasonable jury to conclude that defendant's offered reason for her suspension is pretextual for retaliation. The County maintains that plaintiff was suspended for leaving her post. Plaintiff concedes this fact in her opposition brief. Moreover, plaintiff admits that, shortly before her suspension and counseling, she left her post early one day, did not report the next day, and told Captain Bond that she was suffering from too much stress, drinking too much off-duty, having nightmares, and having marital problems. Based on the record evidence, no reasonable jury could conclude that defendants' offered reason for plaintiff's suspension and counseling is pretextual for unlawful retaliation.[4]

### B. Requests For Days Off In November 1995.

Plaintiff alleges that Lieutenant Pierce denied plaintiff's requests for days off in November 1995 because of plaintiff's reports of sexual harassment over one year earlier to Captain Bond. Again, plaintiff has failed to come forward with any evidence to suggest a causal connection between her reports of Martone's advances and the alleged retaliatory acts. The court will not permit an inference of discrimination when the alleged retaliatory act occurred 14 months after plaintiff's report of sexual harassment, and no evidence suggests that the individual who denied the requested days off even knew of plaintiff's report of sexual harassment. In any case, defendants have offered a legitimate reason for Pierce's denial of the requested days off—plaintiff had missed five of ten days of work prior to asking Pierce for an additional day off, plaintiff had used sick leave even though she was not sick, and the Sheriff's Department was understaffed. Plaintiff has offered no evidence to suggest that defendants' offered reasons for Pierce's actions are pretextual for unlawful retaliation.

### V. Hostile Work Environment Claim.

Defendants next contend that they are entitled to summary judgment with respect to plaintiff's claim of hostile work environment sexual harassment. Plaintiff's hostile work environment claim is limited to her allegations that two deputies made comments to each other regarding oral sex during roll call in 1995 and Trumbo displayed his buttocks to a group of individuals during the Summer of 1995.[5] In order to establish a prima facie case of hostile work environment sexual harassment, plaintiff must present evidence that: (1) she is a member of a protected group; (2) the conduct in question was unwelcome; (3) the harassment was based on

---

4. As explained above, plaintiff's retaliation claim based on her suspension in September 1994 also is barred as untimely. *See supra* part I.

5. Plaintiff's claim regarding Pierce's reference to her as a bitch also is timely but plaintiff did not mention this allegation in support of her hostile work environment claim. In any case, plaintiff cannot establish that Pierce's comment was unwelcome after plaintiff told Pierce to take the Sheriff's Department and stick it up his phony fucking ass. Moreover, we find that Pierce's comment was part of an isolated argument with plaintiff and is not sufficient to constitute severe or pervasive sexual harassment when the comment is viewed alone or together with plaintiff's other allegations.

sex; (4) the harassment was sufficiently severe or pervasive to create an abusive working environment; and (5) that some basis exists for imputing liability to the employer. *See Eichenwald v. Krigel's, Inc.,* 908 F.Supp. 1531, 1539 (D.Kan.1995). Defendants concede that plaintiff is a member of a protected group. The court finds, however, that plaintiff has failed to offer sufficient evidence to establish the third or fourth elements of a prima facie case.

### A. *Severity And Pervasiveness Of Harassment.*

 To meet the fourth element of a prima facie case, plaintiff must establish that the sexual harassment was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (quoting *Henson v. City of Dundee,* 682 F.2d 897, 904 (11th Cir.1982)). "Whether the sexual conduct complained of is sufficiently pervasive to create a hostile or offensive work environment must be determined from the totality of the circumstances." *Sauers,* 1 F.3d at 1126; *see Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). The Supreme Court has noted several factors which may be included in the inquiry, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23, 114 S.Ct. 367. To maintain a Title VII claim for hostile work environment, a plaintiff must establish that her work environment was abusive under both an objective and subjective standard. *See id.,* at 21–22, 114 S.Ct. 367 ("Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation."); *Smith v. Norwest Fin. Acceptance, Inc.,* 129 F.3d 1408, 1413 (10th Cir.1997).

 Plaintiff has failed to produce sufficient evidence for a reasonable jury to find that she subjectively perceived her work environment as hostile. Plaintiff concedes that she cussed on the job, used several variations of the infamous four-letter word, told sexually oriented jokes in the workplace, including jokes about oral sex, and was not offended by sexually oriented jokes. In these circumstances, plaintiff cannot be classified as "a woman of Victorian delicacy—a woman mysteriously aloof from contemporary American popular culture in all its sex-saturated vulgarity." *Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 431 (7th Cir.1995). Rather, plaintiff was an active participant in the use of profanity and sexually oriented jokes at the Sheriff's Department. *See Gross,* 53 F.3d at 1538 (granting summary judgment in part because plaintiff "contributed to the use of crude language on the job site"); *see also Gleason v. Mesirow Financial, Inc.,* 118 F.3d 1134, 1145–46 (7th Cir.1997) (holding that subjective element not met where plaintiff failed to report incidents and plaintiff herself frequently used obscene expletives); *Gan v. Kepro Circuit Sys., Inc.,* No. 81–268C(5), 1982 WL 166, at *3 (E.D.Mo. Jan.7, 1982) (plaintiff "actively contributed to the distasteful working environment by her own profane and sexually suggestive conduct"). Although plaintiff objected to two incidents directed specifically at her as offensive (Williams and Martone), no record evidence suggests that she was offended by the comments she overheard at roll call or Trumbo's display of his buttocks. *See Gross v. Burggraf Constr. Co.,* 53 F.3d 1531, 1537 (10th Cir.1995) ("In the real world of construction work, profanity and vulgarity are not perceived as hostile or abusive. Indelicate forms of expression are accepted or endured as normal human behavior."); *Fortner v. State of Kan.,* 934 F.Supp. 1252, 1269 (D.Kan.1996) (granting summary judgment in favor of defendant on plaintiff's hostile work environment claim because "profanity and cussing are part of the daily life in the military and Forbes Field" and plaintiff "contributed to the profanity at the workplace"), *aff'd,* 122 F.3d 40 (10th Cir. 1997) *cf. Norwest Fin. Acceptance,* 129 F.3d at 1413 (plaintiff met subjective element by her testimony that she felt humiliated and upset by the hostile sexual nature of her supervisor's comments). While the comments during roll call and Trumbo's action certainly were inappropriate in the work-

place, Title VII does not necessarily provide a remedy for these incidents. "The concept of sexual harassment is designed to protect working women from the kind of male attentions that can make the workplace hellish for women.... It is not designed to purge the workplace of vulgarity." *Baskerville*, 50 F.3d at 430; *see Rabidue v. Osceola Refining Co.*, 584 F.Supp. 419, 430 (E.D.Mich.1984) (noting that Title VII was not "designed to bring about a magical transformation in the social mores of American workers"), *aff'd*, 805 F.2d 611 (6th Cir.1986), *cert. denied*, 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987).

For the above reasons, the court concludes that no reasonable jury could find that plaintiff subjectively perceived her work environment as hostile.

### B. *Harassment Based On Sex.*

 To meet the third element of her prima facie case, plaintiff must show that the harassment was based on the fact that she is female. Sexual harassment is behavior "that would not occur but for the sex of the employee.... If the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination." *Gross*, 53 F.3d at 1537 (internal quotations omitted). Plaintiff has not presented any evidence suggesting that the roll call comments or Trumbo's action were directed at females only, intended to make fun of females, or done in an effort to target plaintiff individually. *See Sheehan v. Purolator, Inc.*, 839 F.2d 99, 105 (2d Cir.) (finding no sexual harassment where supervisor's abusive "temper was manifested indiscriminately toward men and women, even his superiors"), *cert. denied*, 488 U.S. 891, 109 S.Ct. 226, 102 L.Ed.2d 216 (1988); *Hillding v. McDonnell Douglas Helicopter Co.*, No. Civ 91–1079PHX RCB, 1992 WL 443421, at *5 (D.Ariz. June 9, 1992) (granting summary judgment in favor of defendant where "alleged harassment was performed by both females and males and directed at both males and females"), *aff'd*, 985 F.2d 573, 1993 WL 22375 (9th Cir.1993); *Weinsheimer v. Rockwell Int'l Corp.*, 754 F.Supp. 1559, 1565 (M.D.Fla.1990) (granting summary judgment for defendant because "[t]he evidence discloses the banter to be gender-neutral, par-

ticipated in by men and women alike"), *aff'd*, 949 F.2d 1162 (11th Cir.1991); *Vermett v. Hough*, 627 F.Supp. 587, 607 (W.D.Mich. 1986) (finding that prank played by fellow officer did not constitute sexual harassment because officer would have performed the same prank "on any other trooper, male or female"). Indeed, the roll call comments apparently were made from one male deputy to another male deputy. Although both reasonable male and female individuals likely would find the roll call comments and Trumbo's action distasteful and inappropriate, no reasonable jury could find that this alleged harassment of plaintiff was on the basis of her sex as a female.

For the above reasons, the court will grant summary judgment in favor of defendants on plaintiff's hostile work environment claim.

## VI. Plaintiff's Section 1983 Claim.

 The County cannot be liable to plaintiff under section 1983 on a theory of vicarious liability or respondeat superior. *See Monell v. Department of Social Services*, 436 U.S. 658, 692, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Sauers*, 1 F.3d at 1129. On the other hand, the County can be liable under section 1983 if an official custom or policy of the County causes an individual to suffer a constitutional violation. *See Thelma D. v. Board of Ed.*, 737 F.Supp. 541, 543 (E.D.Mo. 1990), *aff'd*, 934 F.2d 929 (8th Cir.1991).

We evaluate first what alleged acts are the basis of plaintiff's section 1983 claim. Plaintiff apparently concedes that the appropriate statute of limitations for section 1983 actions arising in Kansas is two years pursuant to Kan.Stat.Ann. § 60–513(a)(4). *See Johnson v. Johnson County Comm'n Bd.*, 925 F.2d 1299, 1300–01 (10th Cir.1991). Accordingly, only plaintiff's claims that arose after April 28, 1995, are timely. The Williams and Martone incidents are not part of this claim because those claims arose in 1993 and 1994.

### A. *Custom Of The County.*

 To establish the existence of a governmental custom of failure to receive, investigate, or act upon complaints of violations of constitutional rights, a plaintiff must prove:

(1) The existence of a continuing, widespread, persistent pattern of misconduct by the governmental entity's employees;

(2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and

(3) That plaintiff was injured by acts pursuant to the governmental entity's custom, *i.e.*, that the custom was the moving force behind the constitutional violation.

*Jane Doe "A" v. Special School Dist.*, 901 F.2d 642, 646 (8th Cir.1990). Plaintiff has not produced sufficient evidence to establish either the first or third elements. First, for the defendants to be held liable, the alleged pattern of constitutional misconduct must be so " 'permanent and well settled' as to have the effect and force of law." *Id.* (quoting *Monell*, 436 U.S. at 691, 98 S.Ct. 2018). Plaintiff's claim of custom does not survive this standard. There is simply no evidence to substantiate the existence of a "continuing, widespread, persistent pattern of misconduct" that had become "so permanent and well settled" as to have the effect and force of law. Plaintiff has no evidence of any sexual harassment in the Sheriff's Department other than her own case. As explained above, the incidents involving plaintiff are insufficient as a matter of law to constitute sexual harassment. Moreover, plaintiff has failed to produce any evidence, or make any allegation, that the alleged custom was the "moving force" behind a constitutional violation. For these reasons, no reasonable jury could find that the County maintained an official custom which deprived plaintiff of a constitutional right.

B. *Policy Of The County.*

 Next, we evaluate plaintiff's evidence of the County's policy regarding sexual harassment. A "policy" is a deliberate choice of action with respect to the subject matter in question. *See D.T. by M.T. v. Independent Sch. Dist. No. 16*, 894 F.2d 1176, 1189 (10th Cir.), *cert. denied*, 498 U.S. 879, 111 S.Ct. 213, 112 L.Ed.2d 172 (1990). Policy is distinguished from custom in that policy is a course of action that has been approved through formal policymaking procedures. *See Harris v. City of Pagedale*, 821 F.2d 499,

506 (8th Cir.), *cert. denied*, 484 U.S. 986, 108 S.Ct. 504, 98 L.Ed.2d 502 (1987). In order to hold the County liable based on the adoption of a "policy," plaintiff must demonstrate that (1) the County's policy constituted deliberate indifference to or reckless disregard for her constitutional rights, and (2) such policy was the moving force behind a constitutional violation. *See D.T. by M.T.*, 894 F.2d at 1192. Plaintiff has not produced sufficient evidence on either element. Again, plaintiff has failed to meet the high standard of causation in this context. There must be a "direct causal connection" between the policy and the constitutional violation, and the identified deficiency in the policy must be "closely related to the ultimate injury." *City of Canton v. Harris*, 489 U.S. 378, 391, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Plaintiff has offered no evidence on this point. Moreover, plaintiff has failed to show that the County's policy reflected intentional or reckless disregard for her constitutional rights. Plaintiff concedes that she understood that neither the County nor the Sheriff's Department condoned sexual harassment. Plaintiff also concedes that the Board of County Commissioners, which is the final policymaker within the County, adopted policies which prohibit discrimination on the basis of sex and expressly prohibit sexual harassment. Moreover, those policies provide aggrieved individuals with a mechanism for reporting sexual harassment. In light of plaintiff's admissions and the lack of evidence of causation, no reasonable jury could find a "policy" which caused plaintiff to suffer a violation of a constitutional right.

IT IS THEREFORE ORDERED that defendant's motion for summary judgment (Doc. # 32) is granted.